UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHINA MEDIAEXPRESS HOLDINGS, INC., by KARL P. BARTH as Receiver,<br>Plaintiff,<br><br>v.<br><br>NEXUS EXECUTIVE RISKS, LTD. (f/k/a/ TORUS EXECUTIVE RISKS, LTD.); TORUS INSURANCE (UK) LIMITED; AIG INSURANCE HONG KONG LIMITED (f/k/a/CHARTIS INSURANCE HONG KONG LIMITED); AMERICAN HOME ASSURANCE COMPANY; CHINA PACIFIC INSURANCE CO., (H.K.) LTD.; and CHINA PING AN INSURANCE (HONG KONG) CO. LTD.,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT** |

## TABLE OF CONTENTS

I. NATURE OF THE ACTION ....................1

II. THE INSURANCE POLICIES ....................6

- A. The Primary Policy ....................6
- B. The First Excess Policy ....................8
- C. The Second Excess Policy ....................8

III. JURISDICTION AND VENUE ....................9

IV. PARTIES ....................9

- A. Plaintiff ....................9
- B. The Defendant Insurers ....................10
- C. Relevant Non-Party ....................10

V. FACTUAL BACKGROUND ....................11

- A. CME Becomes a Publicly-Traded Corporation ....................11
- B. An Affiliate of Starr Invests More than $53 Million in CME ....................11
- C. CME's Stock is Rocked by Allegations of Accounting Fraud, Causing Massive Losses to CME's Shareholders and Investors ....................12
- D. Massive Securities Claims Threaten the Existence of CME ....................12
- E. Notice of Claims and Initial Coverage Determinations by Starr and Torus ....................14
- F. CME's Defense of the Securities Claims ....................15
- G. The Defendant Insurers' Refusal to Advance Costs of Defense ....................16
- H. Torus and Starr's Bad Faith Refusal to Advance Costs of Defense ....................16

VI. THE REFUSAL TO ADVANCE DEFENSE COSTS CAUSES LARGE DEFAULT JUDGMENTS AND DAMAGE AWARDS AGAINST CME ....................22

- A. The Starr Arbitration ....................22
- B. The Securities Class Action ....................23
- C. The Starr Lawsuit ....................24
- D. The SEC Actions ....................24

VII. THE DEFENDANT INSURERS FINALLY DENY COVERAGE ....................25

China MediaExpress Holdings, Inc., by Karl P. Barth, its Court-appointed Receiver (the "Receiver")[1], and through the Receiver's undersigned attorneys, files this Complaint against: i) Nexus Executive Risks, Ltd. (f/k/a/Torus Executive Risks, Ltd.) ("Nexus"); ii) Torus Insurance (UK) Limited ("Torus"); iii) AIG Insurance Hong Kong Limited (f/k/a/Chartis Insurance Hong Kong Limited; iv) American Home Assurance Company ("AIG Hong Kong"); v) China Pacific Insurance Co., (H.K.) Ltd. ("China Pacific"); and vi) China Ping An Insurance (Hong Kong) Co. Ltd. ("China Ping An") (collectively, the "Defendant Insurers"), and alleges as follows:

## I. NATURE OF THE ACTION

1. This action arises from the Defendant Insurers' failure to satisfy their obligations to fund a defense and indemnify China MediaExpress Holdings, Inc. ("CME") for a number of shareholder and SEC actions related to the Company's significant stock drop in February and March of 2011. As a result of the Defendant Insurers' unfounded coverage denials and refusal to fund CME's defense of these matters, CME is now saddled with hundreds of millions of dollars of judgments.

2. A publicly traded company faces a great number of financial risks. One significant risk is the possibility of having to defend itself against securities fraud litigation. When a public company's stock price suffers a significant decline, it is often the target of litigation by unhappy investors to recover the losses they have suffered from investing in the company. These lawsuits are usually brought in the form of a class action representing all purchasers of the company's stock during a certain time frame. The total prospective damages in such a class action can be enormous. Because most companies trade at a significant multiple of earnings, these damages would be well beyond the company's ability to pay. Further, the legal costs of defending a securities class action can also be enormous. The financial consequences of having to defend against such litigation pose a serious risk to a public company. For that reason,

[1] On August 26, 2014, the Honorable Victor Marrero, U.S. District Judge for the Southern District of New York, issued an Order appointing Karl P. Barth (the "Receiver") as the Receiver of China MediaExpress Holdings, Inc. in *In re China MediaExpress Holdings, Inc. Shareholder Litigation*, Case No. 1:11-cv-00804-VM-GWG (Dkt. No. 230).

most public companies purchase directors' and officers' liability insurance to protect against this serious risk.

3. As a smaller-sized growth company, CME did not generate large amounts of income that could be used to fund the defense of this type of litigation. If the company could not properly defend itself, the results could be catastrophic to the company. To protect itself and its directors and officers against these risks, CME paid a substantial premium to purchase a total of $20 million in directors' and officers' liability insurance in three separate insurance contracts: a primary policy of $5 million, an excess policy of an additional $5 million, and an additional excess policy for $10 million in coverage.

4. The "Primary Policy" was a "Directors and Officers Liability and Company Reimbursement Liability Insurance" policy purchased from Torus and Lloyd's Syndicate 1919 CVS ("Starr")[2] numbered B0501DO10AA7U for the policy period October 16, 2010 to October 15, 2011. The Primary Policy required Torus and Starr to advance attorneys' fees and costs incurred by CME in defending claims to which the Primary Policy potentially applied, including, specifically, securities fraud class action litigation.

5. CME purchased the first excess policy from AIG Hong Kong and the second excess policy from China Pacific and China Ping An. Both of these policies "follow form" to, and incorporate the terms of the Primary Policy in all material respects, including the insurers' obligation to fund CME's defense of potentially covered claims.

6. The Primary Policy and the excess policies also required the Defendant Insurers to pay on behalf of CME amounts for covered claims in excess of the Primary Policy's applicable retention that CME became legally obligated to pay as damages by reason of liability imposed by law, including judgments. The claims that have been asserted against CME and the judgments and awards that have been issued in those matters are covered under the Primary Policy and the excess policies.

[2] The Receiver has settled its claims under the Primary Policy against Starr Underwriters Agents, Limited, the managing agent for Lloyd's Syndicate CVS 1919. The Receiver has not resolved its claims under the Primary Policy against Torus.

7.     The basic bargain reflected in the directors' and officers' insurance contracts purchased by CME was that, in exchange for substantial premium payments, the Defendant Insurers agreed to assume the risks of securities litigation against CME, including advancing all of the legal costs and expenses required to defend CME in such litigation prior to the final disposition of such litigation.  Although the Defendant Insurers happily took CME's premium payments, when the time came for them to fulfill their part of the bargain, they refused.

8.     In early 2011, the risk that CME paid significant premiums to the Defendant Insurers to insure against materialized, as CME's stock price declined significantly in response to allegations of accounting fraud made by short-sellers, and the Company was named as a defendant in various lawsuits by unhappy investors.  CME promptly notified the Defendant Insurers of various litigations, arbitrations, investigations, and administrative proceedings arising from these allegations, and started the long and expensive process of defending itself in these lawsuits.   The risks presented by these various actions was significant, exposing CME to hundreds of millions of dollars in potential damages, and required millions of dollars to mount an appropriate defense.  These risks and costs related to the various proceedings commenced against CME were immediately recognized and understood by the Defendant Insurers.

9.     The Primary Policy plainly required Starr and Torus to advance costs to fund CME's defense of the various claims asserted against it prior to the final disposition of such claims, with the insurers retaining the right to recoup advanced costs in the event that it was later determined that they had no obligation to pay for CME's claims.  Despite this clear contractual requirement, both insurers decided to evade their duty to advance CME's defense costs, gambling that factual developments in the underlying matters would provide an after-the-fact justification for their predetermined, but unsupported coverage positions.  At the time that CME requested Starr and Torus advance its defense costs, the insurers had no factual or legal basis for denying coverage under the Primary Policy or refusing to advance CME's defense costs.  CME's excess insurance carriers followed and adapted Torus' and Starr's positions and strategy in this regard.

10.     Instead of announcing their predetermined coverage denials and blanket refusals to advance CME's defense costs, Torus and Starr both acknowledged their coverage obligations for the claims asserted against CME as a general proposition and subject to a reservation of rights.  But despite having acknowledged coverage for CME's claims subject to a reservation of rights and despite a clear contractual obligation to advance CME's defense costs, the insurers concocted various excuses, requested irrelevant information from CME, and asserted unfounded positions regarding the satisfaction of the Primary Policy's retention to justify their refusal to pay every single dime of the defense costs that were submitted to them for reimbursement by CME.

11.     The Defendant Insurers' failure to advance CME's defense costs, failure to indemnify CME for the default judgments and arbitration awards it sustained for covered claims, and wrongful denials of coverage for CME's claims, without any basis, constituted breaches of their contractual obligations under their respective insurance policies.  The Receiver thus seeks damages for breach of contract based on the Defendant Insurers' failure to advance CME's defense costs and failure to indemnify CME for certain default judgments and arbitration awards.

12.     In addition, the Receiver seeks all consequential damages based upon the Defendant Insurers' failure to make a timely, honest, and informed determination regarding CME's claims for insurance coverage based on a diligent investigation conducted in good faith. Rather than advance funding for CME's Costs of Defense, as required by their policies, the Defendant Insurers purported to reserve their rights, withheld any advancement of defense funding in breach of their obligations, and monitored developments in the various claims asserted against CME.

13.     The Defendant Insurers' refusal to advance defense costs on behalf of CME (despite having not denied coverage to CME), requests for largely irrelevant information, unreasonable refusal to consent to an assignment of their policies to effectuate a settlement within their limits of liability, and delay in providing a definitive coverage position, while misleading CME into believing that the insurers were considering advancing CME's defense costs, was calculated and intentional.  The Defendant Insurers expected that the passage of time

would yield further information and/or developments in the underlying litigations that would support their predetermined, but unfounded coverage denials.  The development of a record conducive to supporting their predetermined coverage denials in these matters was made more likely by the Defendant Insurers' refusal to advance funding of CME's defense.

14.     Consequently, CME:  (a) prior to the demise of its business, was forced to pay millions of dollars in attorneys' fees and costs to defend the underlying matters that should have been advanced by the Defendant Insurers; and (b) became liable for hundreds of millions of dollars in default judgments (including a $535.5 million default judgment entered by this Court) and other adverse outcomes that resulted directly from the Defendant Insurers' bad faith refusal to fund CME's defense in the underlying matters.

15.     When CME's unfunded defense later resulted in adverse rulings and default judgments in certain of the underlying matters, the Defendant Insurers seized upon those rulings to justify their predetermined coverage denials and wrongful refusal to provide coverage for CME's defense and to assert that coverage for CME was now unavailable.

The default judgments, adverse arbitration outcomes, and resulting damages suffered by CME due to its unfunded defense were reasonably contemplated by the parties as the probable result of a breach by the Defendant Insurers at the time they sold their policies to CME; the default judgments, adverse outcomes, and damages sustained by CME were a foreseeable consequence of the Defendant Insurers' failure to fulfill their contractual obligations to advance CME's defense costs and bad faith conduct.  The risks of an adverse outcome or default judgment on a covered claim for which the insurers refused to fund a defense was within the contemplation of the Defendant Insurers at the time they sold insurance policies to CME.

16.     The Defendant Insurers' failure to advance CME's defense costs, unwarranted delays, and bad faith in adjusting CME's claims for coverage effectively destroyed the core purpose for which CME purchased directors' and officers' coverage that afforded it "entity coverage" for "Securities Claims":  to provide prompt "advanced" funding for the defense of

"Securities Claims" (as defined in the Primary Policy) asserted against CME prior to the final disposition of such claims.

## II.     THE INSURANCE POLICIES

17.     CME purchased a total of $20 million of director and officer liability coverage from the Defendant Insurers, consisting of:   a primary policy of $5 million; a first excess policy of an additional $5 million in coverage; and a second excess policy providing an additional $10 million in coverage.

### A.     The Primary Policy

18.     Torus and Starr issued the Primary Policy to CME.  The Primary Policy had a policy period of October 16, 2010 to October 15, 2011 (the "Policy Period") and provides a $5 million aggregate limit.  Torus and Starr are each responsible for paying 50% of all losses covered under the Primary Policy, including "Costs of Defense," subject to the Primary Policy's limits of liability.  The Primary Policy is a "claims made" policy that provides coverage for losses arising from claims first made against insured entities and individuals during the Policy Period, such as the underlying "Securities Claims" asserted against CME.  A copy of the Primary Policy is attached hereto as Exhibit A.

19.     CME paid a premium of $72,000 (U.S.) for the Primary Policy.  All other applicable conditions and prerequisites to coverage under the Primary Policy have been satisfied.

20.     The Primary Policy provides broad coverage for "Losses" arising from a "Wrongful Act," with a "Wrongful Act" defined to include "any actual or alleged act, omission, error, misstatement, misleading statement, neglect or breach of duty" by CME with respect to Insuring Agreement I.C.

21.     Insuring Agreement I.C. of the Primary Policy provides coverage to CME for "Loss," including "Costs of Defense," that CME becomes "legally obligated to pay as a result of a Securities Claim."

22.     "Loss" is defined in the Primary Policy to include "compensatory damages, punitive or exemplary damages, the multiple portion of any multiplied damage award, settlements and Costs of Defense…."

23.     A "Securities Claim" is defined as "any Claim (including a civil lawsuit or criminal proceeding brought by the Securities and Exchange Commission) made against an Insured alleging a violation of any law, regulation or rule, whether statutory or common law, which is:  (1) brought by any person or entity alleging, arising out of, based upon or attributable to, in part or in whole, the:  (a) purchase or sale of, or (b) offer or solicitation of an offer to purchase or sell, any securities of the Company, or (2) brought by a security holder of the Company, arising solely with respect to such security holder's interest in such securities of the Company, whether directly, by class action, or derivatively on behalf of the Company." Coverage for Loss as a result of a "Securities Claim" is the only coverage available to CME under the Policy.

24.     The Primary Policy requires that the Primary Insurers "*advance* Costs of Defense *prior to the final disposition* of any Claim, provided such Claim is covered by the Policy" (emphasis added).  Specifically, Section VII(E) provides:

> The Insurer shall advance Costs of Defense prior to the final disposition of any Claim, provided such Claim is covered by this Policy.  Any advancement shall be on the condition that:
>
> (1) the appropriate retention has been satisfied, provided, however, this condition shall not apply in the event of the Financial Insolvency of the Company;
>
> (2) any amounts advanced by the Insurer shall serve to reduce the Limit of Liability stated in Item 3 of the Declarations to the extent they are not in fact repaid;
>
> (3) The Company and Insured Persons and the Insurer have agreed upon the portion of the Costs of Defense attributable to covered Claims against the Insureds; and
>
> (4) in the event it is finally established that the Insurer has no liability under the Policy for such Claim, the Company and Insured Persons will repay the Insurer upon demand all Costs of Defense advanced by virtue of this provision.

Thus, it was mandatory ("the Insurer *shall*") for the Defendant Insurers to advance the Costs of Defense for all Claims that they did not deny coverage, prior to the final disposition of such Claims.  The relevant provision did not allow the insurers to withhold advancement of Costs of

Defense for covered claims for any reason, including to allow the insurers time to investigate any purported coverage defenses related to the placement of the Primary Policy.  The requirement that the insurers advance Costs of Defense prior to the final disposition of the underlying claims was a fundamental and material term of the bargained-for agreement reflected in the Primary Policy.

25.     Significantly, the Primary Policy expressly states that Insuring Agreements A, B, and C (Insuring Agreement I.C., provides coverage to CME for Securities Claims) "*may not be rescinded*" (emphasis added).

**B.     The First Excess Policy**

26.     AIG Hong Kong issued CorporateGuard Excess Policy No. DOL0003296/000000 (the "First Excess Policy") to CME.  CME paid a premium of $47,000 (U.S.) for the First Excess Policy.  The First Excess Policy was issued for the same Policy Period as the Primary Policy and provides a $5 million aggregate limit for losses that exceed the coverage provided by the Primary Policy.  Coverage under the First Excess Policy is "in conformity with the terms, conditions, exclusions and endorsements of the Primary Policy, together with all limitations, restrictions or exclusions contained in or added by endorsement to any other Underlying Insurance, except as varied by the terms and conditions and endorsements attaching to this policy."  A copy of the First Excess Policy is attached hereto as Exhibit B.

**C.     The Second Excess Policy**

27.     China Pacific and China Ping An issued Excess Financial Products Insurance Policy No. CPIC/DNO/2010/000004 (the "Second Excess Policy," and, together with the Primary Policy and First Excess Policy, the "Policies") to CME.  The Second Excess Policy provided that all notices to either China Pacific or China Ping An were to be given to NIC Insurance Company, One Penn Plaza (55th Floor), New York, NY 10119, ATTN:  Navigators Pro Claims Department, within this judicial district.

28.     CME paid a premium of $74,375 (U.S.) for the Second Excess Policy.  The Second Excess Policy was issued for the same Policy Period as the Primary Policy and provides

a $10 million aggregate limit for losses that exceed the coverage provided by the Primary Policy and the First Excess Policy. The Second Excess Policy is "subject to the same warranties, terms, conditions, definitions, exclusions and endorsements (except as regards the premium, the amount and Limits of Liability, and duty to defend and except as otherwise provided herein) as are contained in or as may be added to the Primary Insurer, together with all the warranties, terms, conditions, exclusions and limitations contained in or added by endorsement to any Underlying Excess Policy(ies)." China Pacific and China Ping An share responsibility under the Second Excess Policy pursuant to a "Coinsurance Clause," whereby China Pacific is required to pay 60% and China Ping An 40% of all covered Losses. A copy of the Second Excess Policy is attached hereto as Exhibit C.

## III. JURISDICTION AND VENUE

29. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 754 and this Court's jurisdiction to decide all questions of the preservation, collection and distribution of the assets of an entity in receivership in this Court.

30. This Court further has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because: i) Plaintiff is a Delaware corporation with its principal place of business in the People's Republic of China, while the Defendant Insurers are citizens of the United Kingdom, Hong Kong and New York; and ii) the amount in controversy exceeds the sum of $75,000.

31. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Many of the acts charged herein, including one of the underlying securities litigations for which CME has demanded coverage from the Defendant Insurers, occurred in substantial part in this District.

## IV. PARTIES

### A. Plaintiff

32. Plaintiff China MediaExpress Holdings, Inc. was, during the relevant period, a Delaware corporation with its principal place of business at 22/F Wuyi Building, 33 Dongjie Street, Fuzhou, China. This action is brought on behalf of CME by its Court-appointed

Receiver, Karl P. Barth.  The Receiver was appointed by the Honorable Victor Marrero on August 26, 2014 in the action pending in this District captioned *In re China MediaExpress Holdings, Inc. Shareholder Litigation*, Case No. 1:11-cv-00804-VM-GWG, filed in the United States District Court for the Southern District of New York (the "Class Action").  The Receiver is a citizen and resident of King County, Washington.

**B.     The Defendant Insurers**

33.     Nexus Executive Risks, Ltd. (f/k/a/Torus Executive Risks, Ltd.) is a United Kingdom company with its principal place of business at 150 Leadenhall Street, London, EC3V 4QT, United Kingdom.

34.     Torus Insurance (UK) Limited is a United Kingdom company with its principal place of business at 88 Leadenhall Street, London, EC3A 3BP, United Kingdom.

35.     AIG Insurance Hong Kong Limited (f/k/a/Chartis Insurance Hong Kong Limited) is a Hong Kong company with its principal place of business at 46/F, One Island East, 18 Westlands Road, Island East, Hong Kong.

36.     American Home Assurance Company is a New York Corporation with its principal place of business at 175 Water Street, 18th Floor, New York, NY 10038.

37.     China Pacific Insurance Co., (H.K.) Ltd. is a Hong Kong company with its principal place of business at Suite 4301, Central Plaza, 18 Harbour Road, Wanchai, Hong Kong.

38.     China Ping An Insurance (Hong Kong) Co. Ltd. is a Hong Kong company with its principal place of business at 11/F, Dah Sing Financial Centre, 108 Gloucester Road, Wanchai, Hong Kong.

**C.     Relevant Non-Party**

39.     Lloyd's Syndicate CVS 1919, acting through Starr Underwriting Agents Ltd. ("Starr") was a co-underwriter of the Primary Policy, responsible for 50% of the face value of the Primary Policy, or a total of $2.5 million.  Starr is not a Defendant in this Action because it recently settled all claims against it related to this coverage dispute with the Receiver.

## V. FACTUAL BACKGROUND

### A. CME Becomes a Publicly-Traded Corporation

40. CME was formed in October 2009 through a "reverse-merger" transaction whereby the Chinese company Hong Kong Mandefu was acquired by publicly-traded TM Entertainment and Media, Inc., a Delaware corporation with its headquarters in New York City. The surviving company was immediately renamed CME, and its shares began to trade on the NYSE AMEX under the ticker symbol "CCME," moving to the NASDAQ under the same ticker symbol on June 3, 2010. Immediately prior to the reverse merger, TM Entertainment and Media stock traded at $7.66 per share. After the reverse merger transaction, CME shares rose more than 25% to generally trade between $10.00 and $12.00 for the rest of 2009.

### B. An Affiliate of Starr Invests More than $53 Million in CME

41. After an extensive due diligence process, in January 2010, Starr Investments Cayman II, Inc. ("Starr Investments"), a corporate affiliate of Starr, invested $30 million in shares of CME stock and warrants, and purchased additional shares of stock from the founders of CME for another $13.5 million. Soon after completing these transactions in early 2010, Starr Investments exercised its warrants, paying an additional nearly $10 million for more than 1.5 million shares of CME. Starr Investments' total investment in CME was approximately $53.5 million.

42. Shortly after Starr Investments' purchase of CME securities, CME stock traded at a little over $14.00 per share. CME continued reporting good financial results throughout 2010, and its shares trended upward to close at $15.84 by the end of 2010. This general upward trend in CME's share price continued during the first month of 2011, with CME shares closing at a Class Period high of $22.81 per share on January 27, 2011. At this peak, based on its approximately 34 million shares outstanding, CME had a total market capitalization of more than $780 million.[3]

[3] CME had 34,290,552 shares outstanding as of November 8, 2010.

**C. CME's Stock is Rocked by Allegations of Accounting Fraud, Causing Massive Losses to CME's Shareholders and Investors**

43. On January 13, 2011, Citron Research published an analyst report questioning multiple aspects of CME's business operations and accounting. The release of this critical report caused CME shares to decline more than 14% to close at $17.84 per share.

44. On February 3, 2011, notorious "short-seller" Muddy Waters released a report alleging accounting fraud at CME. In response, CME's share price dropped more than 33% to close at $11.09 per share.

45. On March 11, 2011, CME's auditor resigned, and CME stock was immediately suspended from trading by the NASDAQ. When trading resumed more than two months later on May 19, 2011, CCME shares plummeted to just $2.16 per share. Months later, CME stock was trading for just pennies a share, and the shares no longer trade. CME went from a market capitalization of more than $780 million to zero – a total loss for investors.

**D. Massive Securities Claims Threaten the Existence of CME**

46. Disgruntled investors quickly sought to recover the considerable losses they suffered from investing in CME securities. CME faced massive potential exposure from these claims (described below and hereinafter collectively referred to as the "Securities Matters"), potentially in the hundreds of millions of dollars, an amount that could easily bankrupt the Company. The Securities Matters included: 1) a Hong Kong arbitration filed by Starr Investments; 2) a federal lawsuit from Starr Investments; 3) a class action securities fraud lawsuit; 4) an SEC investigation and subsequent administrative proceeding; 5) a federal civil lawsuit filed by the SEC; and 6) various litigations filed in the Delaware Chancery Court:

**1. Starr's Hong Kong Arbitration**

47. Starr Investments filed an arbitration against CME in Hong Kong on March 17, 2011 by (the "Starr Arbitration"). Starr Investments is a corporate affiliate of Starr (one of the insurers making the determination of whether to advance the costs of defending this action).

**2. Starr's Delaware Securities Fraud Action**

48. A lawsuit was filed by Starr Investments on March 18, 2011 against CME in the U.S. District Court for the District of Delaware (the "Starr Lawsuit") alleging violations of the federal securities laws against CME.[4]

**3. The Securities Fraud Class Action**

49. An initial shareholder class action was filed on February 4, 2011 in this District, alleging violations of the Securities Exchange Act of 1934 on behalf of all purchasers of CME securities during the class period (the "Class Action"). Numerous other related complaints seeking class action status were filed, and were ultimately consolidated into a single action captioned *In re China MediaExpress Holdings, Inc. Securities Litigation*, No. 11-0804 (VM) in the United States District Court for the Southern District of New York, and assigned to the Honorable Victor Marrero. The vast majority of CME's shareholder claims were incorporated into the Class Action, and the vast majority of CME's financial exposure and risk (in the hundreds of millions of dollars) was from this lawsuit.

**4. SEC Investigation and Administrative Proceeding**

50. A formal investigation was opened by the U.S. Securities and Exchange Commission in late March 2011 (the "SEC Investigation"). This investigation ultimately led to an administrative proceeding brought against CME by the in March of 2012 (the "SEC Administrative Proceeding").

**5. SEC Civil Litigation**

51. On June 30, 2013, the SEC filed a civil lawsuit in federal court in Washington, DC against CME (the "SEC Lawsuit").[5] This complaint alleged that CME had violated the federal securities laws by, *inter alia*, misstating its reported financial results.

[4] *Starr Investments Cayman II Inc. v. China MediaExpress Holdings Inc. et al.*, No. 1:11-cv-00233-RGA (D. Del.)

[5] *SEC v. China MediaExpress Holdings, Inc.*, No. 1:13-cv-00927-ESH (D. D. C.)

**6. Delaware Chancery Litigation**

52. Later in 2011 and throughout2012 and 2013, numerous additional lawsuits were filed against CME, including multiple shareholder derivative litigations and several "books and records" actions filed in Delaware Chancery Court, which were ultimately consolidated (the "Delaware Action").

**E. Notice of Claims and Initial Coverage Determinations by Starr and Torus**

53. The Securities Matters presented massive financial exposure to CME that was plainly in the hundreds of millions of dollars in potential losses – an amount that was far beyond CME's ability to pay. But CME had prudently purchased insurance to protect the Company against such a catastrophe. The $20 million in insurance coverage was sufficient to defend the Securities Claims, and if necessary, settle them without bankrupting CME.[6] Having purchased this insurance to protect itself from such an event, the CME quickly notified the Defendant Insurers of the Securities Claims and sought legal counsel to defend against the Securities Claims.

54. In February 2011, CME retained Loeb & Loeb ("Loeb") to defend the company in the Class Action. CME would later expand Loeb's retention to include the Starr Arbitration, the Starr Litigation, the SEC Investigation and Administrative Action, and the Delaware Chancery Litigation.

55. On February 8, 2011, CME, though its counsel, timely reported the Class Action to the Defendant Insurers and requested coverage, including for payment of CME's Costs of Defense. CME also requested that Torus and Starr approve the company's retention of Loeb as defense counsel for the Class Action.

56. By letter dated April 1, 2011, Torus acknowledged that the Primary Policy covered the Class Action and the Starr Litigation and reserved its rights (but did not deny coverage) as to certain coverage defenses. Torus' reserved defenses included various potentially

[6] $20 million in well beyond the average class action recovery against Chinese or Chinese Reverse-merger companies, even with potential damages as large as those faced by CME.

applicable coverage exclusions, as well as defenses based upon CME's Proposal Form. Torus also specifically consented to Loeb representing CME in the Class Action.

57. On April 21, 2011, Starr issued its own reservation of rights letter for the Securities Matters. Starr reserved its rights (but did not deny coverage) in the event that, among other things, "material facts and circumstances disclosed in and in connection with the inception/renewal of the insurance on 16th October 2010 were mis-represented." Starr stated in this letter that it would follow up with requests for additional information from CME relevant to its purported reservations of rights.

58. By letter dated May 12, 2011, Torus acknowledged coverage, in part, for the Starr Arbitration. Torus also specifically consented to Loeb representing CME in the Starr Arbitration. This letter also committed Torus to advancing the Costs of Defense as follows:

> Section VII also specifies that Torus shall advance Costs of Defense prior to the final disposition of any Claim, once the Retention has been satisfied. We request that the Insureds instruct their defense counsel to send us all of their bills so that we can monitor the erosion of the $200,000 retention.

59. Also on May 12, 2011, Starr specifically consented to Loeb & Loeb representing CME in the Class Action as well as the Starr Litigation. Like Torus, Starr similarly acknowledged that:

> Section VII (E) of the Policy states that the Insurer shall advance Costs of Defense prior to the final disposition of any Claim, once the appropriate retention has been satisfied. Subject to the above reservation of rights, we should be grateful if you could ask the Insured to instruct Loeb & Loeb and Shearman & Sterling to send us copies of all invoices addressed to them so that we can monitor the erosion of the US$200,000 retention.

60. AIG Hong Kong, American Home Assurance, China Pacific and China Ping An (together, the "Excess Insurers") agreed with and adopted the coverage positions asserted by Torus and Starr.

**F. CME's Defense of the Securities Claims**

61. Believing that the Defendant Insurers would honor their obligations under the Primary Policy, Loeb began preparing for the defense of the Securities Claims, including

investigating potential strategies and legal defenses, coordinating the hiring of local counsel in Delaware for the Starr Litigation and the Delaware Chancery Litigation, and retaining expensive experts to begin the process of compiling and preparing CME's documents to respond to the inevitable discovery requests.

### G. The Defendant Insurers' Refusal to Advance Costs of Defense

62. From the beginning, Starr and Torus determined that they would not comply with their obligations under the Primary Policy (including the obligation to advance Costs of Defense). Although they had no grounds to deny coverage for the matters asserted against CME, the Defendant Insurers made an improper predetermination that facts supporting a coverage defense would be unearthed in the numerous lawsuits or the scores of reporters investigating CME. Perhaps fearing that attempting to recover previously advanced Costs of Defense from a company based in the People's Republic of China (and having no assets in the U.S.) might be difficult or impossible, they improperly refused to advance CME's Costs of Defense for the Securities Matters.[7]

### H. Torus and Starr's Bad Faith Refusal to Advance Costs of Defense

63. Because the Defendant Insurers: (a) reserved rights, but did not deny coverage; (b) approved Loeb as CME's defense counsel; (c) requested updates regarding the status of the various Securities Matters; (d) requested copies of defense bills; and (e) indicated that at least some of the underlying matters were covered under the Primary Policy, CME reasonably

[7] In addition, Starr had a nefarious and compelling reason (in which Torus and the Excess Insurers were complicit) to deny CME's requested advancement of defense costs for the Securities Claims – Starr Investments - a corporate affiliate of Starr - was the plaintiff asserting the claims against CME in both the Starr Arbitration and the Starr Litigation. While it might be understandable for a plaintiff to not want to also pay for the defense of a lawsuit, such a desire is not a valid reason to deny insurance coverage. This highly unusual situation raised a clear conflict where Starr's loyalties were divided on both sides of the Starr Arbitration and the Starr Litigation. There can be no denying this conflict of interest, particularly in light of the fact that a majority of the board of Starr Investments were also employees of C.V. Starr & Co., the parent company of Starr Underwriting Agents, Ltd.

expected throughout 2011 that the Defendant Insurers would fulfill their obligation to advance CME's Costs of Defense.

64.     But in reality, Starr and Torus had no intention of fulfilling their contractual obligations to advance CME's Costs of Defense for the Securities Matters.  Instead, in the absence of any legal or factual basis for denying CME's coverage claim and withholding Costs of Defense funding, the Defendant Insurers purported to reserve their rights, while fabricating an endless litany of excuses, irrelevant coverage defenses, requests for information, and absurd arguments related to the Policy's retention to justify their refusal to advance CME's Costs of Defense.

65.     On August 19, 2011, Loeb notified Torus and Starr that it had retained document expert BDO to assist in CME's defense of the Securities Matters.  Specifically, BDO was retained to preserve relevant documents and electronic data, including summarizing and translating certain documents.  Loeb specifically explained that these services were necessary to comply with CME's obligations to collect and preserve evidence for the Securities Matters, as well as the SEC Investigation.   Loeb sent the BDO invoices, along with its own invoices evidencing CME's Costs of Defense, to Torus and Starr and requested payment.

66.     On September 23, 2011, counsel for Starr wrote Marsh (CME's insurance broker), not to pay the Loeb or BDO invoices, but to fabricate an excuse for <u>not</u> paying the invoices. Starr notified CME that it was refusing to advance Costs of Defense pending the production of certain documents it was requesting from CME.  Starr falsely indicated that it was entitled to receive and evaluate these documents before deciding if it would agree to advance CME's Costs of Defense:

> [Starr] is putting the insureds on notice that it requires the information requested below to be provided before making a decision on whether to reimburse any defense costs by way of advance.

Nothing in the Primary Policy permits the insurers to withhold the advancement of Defense Costs based upon information requests related to alleged coverage defenses.

67.     Starr's requests for information were purportedly related to its potential coverage defense based on its bald allegation that it may be entitled to avoid its obligations and void the Primary Policy because of alleged misrepresentations by CME during the underwriting process. But Starr's information requests were wholly irrelevant, given the Primary Policy's express provision that coverage under Sections I.A, B., and C. was not "rescindable."  It was not possible for Starr (or any Defendant Insurer for that matter) to void the Policy in order to avoid its obligations to CME, including the obligation to advance Costs of Defense, based upon any sort of rescission-based defense.

68.     Moreover, Starr's requests for information were made five months after Starr had initially reserved its rights and consented to Loeb's representation of CME.  The document requests purported to cover every aspect of CME's business, but were largely unintelligible and could be interpreted to include almost every document created by the company (i.e. "Our client would be grateful if it could be provided with evidence to demonstrate that the total net revenue and net income figures reported in the 2009 Form 10-K are accurate").  It was patently unreasonable to wait for more than seven months after the Class Action was filed and CME provided notice of its claims (and more than six months after the Starr Arbitration and the Starr Lawsuit were filed) to ask for the documents that Starr wrongfully maintained were relevant to its determination regarding whether to advance Costs of Defense.  This request for information was nothing more than a pretext for Starr to delay its obligations to advance CME's Costs of Defense.

69.     On September 29, 2011, Torus also refused to advance any of the Costs of Defense submitted by Loeb, employing a different (yet equally baseless) excuse to justify its refusal to advance CME's Costs of Defense.  Torus acknowledged receipt of Loeb's invoices from February through June 2011 totaling $514,072, and its expenses totaling $430,710, for total defense costs of $944,782.  Instead of paying these invoices (to the extent they exceeded the applicable retention), Torus concocted a baseless and self-serving allocation formula, determining that only $104,739 of this amount was reimbursable (unsurprisingly an amount less

than the retention amount, thus not requiring Torus to pay anything).  This calculation was merely a pretext for Torus to avoid paying Costs of Defense, and was plainly incorrect and in violation of the requirements of the Primary Policy.  Torus never amended its position that the $200,000.00 retention applicable under the Primary Policy had not been satisfied despite receiving documentation over the course of 2011-13 evidencing millions of dollars of Costs of Defense incurred by CME and other insureds for matters for which Torus had acknowledged coverage under the Primary Policy.

70.     In a November 22, 2011 letter, CME agreed to provide information responsive to Starr's requests and reiterated the company's prior request that Starr and Torus advance funding for CME's Costs of Defense incurred in connection with the Securities Matters.  In its letter, CME highlighted the Primary Policy's requirement that Torus and Starr advance Costs of Defense prior to the final disposition of the Securities Matters and noted that in the event it was later determined that the insurers had no responsibility for CME's claims, then CME would be required to repay any advanced Costs of Defense.

71.     On November 30, 2011, Loeb & Loeb submitted additional invoices to Torus and requested payment.

72.     On January 20, 2012, Marsh, on behalf of CME, sent an email to counsel for Torus seeking the status of the reimbursement of CME's outstanding Costs of Defense:

> Chris/Bill:
>
> Can I please have a copy of your coverage response to Loeb & Loeb's submission of defense invoices on November 30, 2011.

Marsh received no response to this simple request.

73.     On March 12, 2012, Marsh sent another email on behalf of CME to counsel for Torus seeking the status of the reimbursement of certain outstanding Costs of Defense:

> Chris/Bill:

> I have had no response to my note below sent to you a couple of months ago. Please let me know the current status of the information requests sent to China Media and your review of the defense invoices submitted by Loeb & Loeb on November 30 last year.

74.     On March 26, 2012, counsel for CME pointed out the absurdity of Starr's refusal to advance the Costs of Defense:

> I know that Starr has asked for a broad range of documents, purportedly to investigate whether CCME misrepresented its financials in applying for the insurance.  Starr bases its request on the allegations in the various complaints (presumably including its own).  We pointed out that that position could be maintained in every shareholder class action and derivative action.  They nonetheless persist.  Torus seems to be going along for the ride. We have yet to receive any payment from either and I do not believe they have responded in writing to our last communication.

75.     On September 7, 2012, Loeb submitted additional invoices related to its representation of CME to both Torus and Starr.

76.     In a September 8, 2012 email to Marsh, counsel for Torus attached a spreadsheet that identified the defense invoices that Torus had not paid.  Torus again refused to pay these Costs of Defense, citing "coverage issues and requests that remain unanswered."

77.     On September 10, 2012, Marsh sent another email on behalf of CME to counsel for Torus, complaining that Torus' refusal to advance defense costs was a "most unsatisfactory position":

> We really need to move this forward – we have a number of insureds with significant costs exposure and no reimbursement from Torus.  This is a most unsatisfactory position, particularly given Torus' prior confirmation of cover.

78.     On September 19, 2012, counsel for Torus requested a replacement copy of one of the invoices submitted by Loeb on September 7, 2012, purportedly because "we are missing page 3 of your invoice no. 1465748."  This email conveyed the false impression that Torus intended to pay this invoice, when it did not.

79.    Following further discussions and exchanges of correspondence between counsel for CME and Starr, Starr acknowledged receiving CDs containing "over 10,000 pages in total" of documents from CME's defense counsel responsive to its requests for information.

80.    Nevertheless, Torus (and Starr) continued to refuse to advance CME's Costs of Defense for the Securities Matters, with Starr complaining in an October 19, 2012 letter that the documents provided by CME were voluminous, did not include an index, and were in Chinese. Starr has never indicated that it has reviewed even a single page of the materials provided in response to Starr's information requests, the receipt of which was used as a justification to deny CME's requests to advance Costs of Defense.

81.    On April 2, 2013, in an update to counsel for AIG Hong Kong, Marsh described the "unhappy" conditions caused by Torus with respect to the coverage dispute:

> As I understand the position, the status of the underlying claim is not a happy one. Nothing has been paid by primary insurers because counsel for primary insurers have declined to advance defense costs and I believe that there is a volume of information requested from China Media which may still be outstanding. Counsel for China Media and the Side B defendants, Loeb & Loeb, have been trying to remove themselves from the litigation as they have not been paid their fees. Loeb & Loeb blame primary insurers' counsel for unreasonably refusing to advance defense costs which they believe had prejudiced the defense and caused them not to be paid. In the event counsel for the plaintiff class in the US litigation are seeking an assignment of the rights to the China Media insurance contracts. Marsh Hong Kong are in touch with counsel for primary insurers on this issue and have asked them to conference with Loeb & Loeb to seek a resolution.

82.    Unfortunately, counsel for the primary insurers refused to seek a resolution of these issues, leading to substantial damage to CME.

83.    Throughout this period, the Excess Insurers were kept apprised of developments in the Securities Matters and the coverage positions asserted by Torus and Starr. The Excess Insurers continued to follow and adopt the wrongful coverage positions asserted by Torus and Starr.

## VI. THE REFUSAL TO ADVANCE DEFENSE COSTS CAUSES LARGE DEFAULT JUDGMENTS AND DAMAGE AWARDS AGAINST CME

84. By early 2012, without any insurer funding, CME was severely prejudiced in its defense of each of the following Securities Claims. The failure to advance defense costs directly led to a total of almost $625 million in court judgments and arbitration awards being entered against CME in the following Securities Claims:

### A. The Starr Arbitration

85. The Starr Arbitration was factually complex, requiring a significant commitment of time and effort to defend properly. But by the time of the Starr Arbitration hearing in May 2012, Loeb had grown very concerned about its mounting unpaid invoices and was unwilling to devote the time and resources toward providing an adequate defense in the arbitration. Instead of mounting a vigorous defense, Loeb did not put on any evidence, merely asserting that the plaintiff's evidence did not meet the burden of proof required to establish CME's liability. Although undoubtedly inexpensive, this was a foolish and reckless strategy employed only because Loeb was growing concerned about its perceived risk of nonpayment from Torus. Indeed, Loeb later admitted it defended CME "on the cheap" because of the Defendant Insurers' refusal to advance defense costs:

> Neither insurer has paid a penny, and as you know one of the insurers is Starr — and is adverse to CME in two litigations. Starr has invented coverage issues to avoid its coverage responsibilities, and as a result we were forced to defend the arbitration — initiated by Starr — on the cheap. Starr won. CME cannot defend itself in any of the remaining litigations, including the one initiated by Starr in Delaware, and owes us hundreds of thousands of dollars. As a result, we have sought to withdraw from the litigations, but the judge in SDNY will not let us out unless successor counsel comes in. Because the insurers have not met their coverage obligations CME cannot pay us, much less successor counsel. (emphasis added).[8]

86. The Final Awards were issued by the arbitration panel on December 12, 2012. Unaware that Loeb's concern for its own profits led to the "on the cheap" defense eschewing the

[8] March 25, 2013 e-mail from Eugene Licker to CME's insurance broker Marsh.

introduction of evidence, the panel entered a presumption and inference against CME based on the lack of evidence supporting its defense:

> Instead of tendering evidence to explain the evidence relied upon by Starr, CME chose to rely principally on the burden of proof and assert that Starr had failed to prove its allegations.

87.     In the absence of a robust defense, the arbitration panel drew adverse inferences against CME pursuant to the maxim that the "production of weak evidence when strong is available can only lead to the conclusion that the strong would have been adverse" to CME:

> It follows that this tribunal is entitled to infer – as we do – that if CME had produced its business records, certified bank statements and advertising contracts, if it had explained how its "thriving" and "profitable" business and its cash reserves had disappeared and if it had called evidence from its Audit Committee and its then Chief Financial Officer, Jacky Lam, and its 20 customers, its defense would have been adversely affected.  Hence, the failure of CME to tender evidence concerning these matters makes it easy to draw every reasonable inference adverse to CME.

This inference caused the panel to award Starr's corporate affiliate (Starr Investments) approximately $40 million (plus interest at 23%) against CME (the "Final Awards").

**B.      The Securities Class Action**

88.     By early 2013, following further refusals by the Defendant Insurers to pay Loeb's outstanding invoices or otherwise advance any of CME's Costs of Defense for the Securities Matters, Loeb sought to terminate its representation of CME based on the non-payment of its attorneys' fees and expenses.  Accordingly, on February 19, 2013, Loeb requested permission from the Court to file a motion to withdraw as counsel for CME in the Class Action.  Counsel for the plaintiffs in the Class Action contested Loeb's withdrawal, but Loeb ultimately was permitted to withdraw from defending CME in the Class Action on June 25, 2013.

89.     Because CME was unrepresented by counsel in the Class Action, the Court entered a default judgment against CME in the amount of $535.5 million on January 17, 2014.

90.     In addition to failing to fund the defense of CME in the Class Action, the Defendant Insurers also refused an opportunity to settle all Class claims against CME for an amount within policy limits that would have allowed CME to conclude the litigation with no

judgment or other financial obligation to the Class. In March 2013, Class Counsel (who was aware of the ongoing coverage dispute) approached Loeb with an offer to settle all claims against CME for an assignment of the Company's rights under the insurance policies. This would have been an excellent result for CME, and would have removed the risk that the company could be on the hook potentially for hundreds of millions of dollars in the event that it lost the Class claims at trial. But, upon information and belief, the insurers unreasonably refused. Class Counsel's proposal was rejected, and the Class later obtained a $535.5 million judgment against CME.[9]

**C. The Starr Lawsuit**

91. Similarly, on February 21, 2013, Loeb filed a motion to withdraw as counsel for CME in the Starr Lawsuit. Loeb's motion to withdraw as counsel to CME in the Starr Lawsuit was granted on April 11, 2013.

92. With CME unrepresented by counsel, a default judgment on liability issues was entered in favor of Starr Investments against CME on August 21, 2014. This judgment has not yet been reduced to a damage award.

**D. The SEC Actions**

93. The SEC civil complaint was not filed until June 20, 2013, after Loeb had already quit as CME's counsel in the Starr Litigation and the Class Action. Without insurance funding, CME was unable to retain counsel to defend this action because of the refusal of the Defendant Insurers to provide defense costs. Accordingly, CME did not appear in the action, and the SEC obtained a default judgment against CME on October 3, 2013 for disgorgement in the amount of $41,894,082.05.[10] The default judgment also awarded an additional $7,250,000.00 to the SEC as a civil penalty, for a total judgment of $49,144,082.05.

[9] Loeb may also be complicit in sabotaging the proposal because it preferred the insurance policy to instead pay Loeb's outstanding invoices.

[10] The Court's Order specifically allowed CME to offset this amount by any amount collected by investors from litigation against CME.

## VII. THE DEFENDANT INSURERS FINALLY DENY COVERAGE

94. Shortly after Loeb began to take actions to terminate its representation of CME, on April 23, 2013, Torus reiterated that it would not advance any of CME's defense costs and, for the first time, issued a coverage denial based on alleged deficiencies in CME's disclosures during the underwriting process for the Primary Policy. Torus issued its coverage denial over two years after CME first requested coverage for the Underlying Securities Matters. Torus based its coverage denial, in large part, on the Final Awards in the Starr Arbitration, for which it had refused to advance CME's Costs of Defense. Torus also noted that a default judgment in the Class Action would constitute and adjudication on the merits that would trigger certain policy exclusions.

95. In an April 30, 2013 letter, Starr "endorse[d] and repeat[ed]" the coverage denial set forth in Torus' April 23, 2013 letter.

96. Upon information and belief, the Excess Insurers have adopted the coverage denials asserted by Starr and Torus.

## COUNT I

**Breach of Contract Regarding Defense - Against The Defendant Insurers**

97. Plaintiff repeats and realleges each and every allegation contained above and below as if fully set forth herein.

98. The Defendant Insurers sold the Policies to CME, which obligated the Defendant Insurers to advance CME's Costs of Defense incurred in defending potentially covered claims once CME's Costs of Defense exceeded the applicable retention.

99. The Defendant Insurers' defense obligations under the Policies were broader than their obligation to pay damages. The Defendant Insurers were required to advance CME's Costs of Defense if any facts or allegations alleged in the Securities Matters were within the protection purchased, which at least one of the Defendant Insurers has conceded.

100. CME incurred and paid Costs of Defense that exceeded the retention applicable under the Policies.

101. CME, Loeb, and the Receiver have all demanded that the Defendant Insurers pay the Costs of Defense that have been incurred in the Securities Matters that exceeded the Policy's retention.

102. CME fulfilled all of its duties under the Policies, including the payment of premiums, as well as any duty it may have had to notify the Defendant Insurers of the Securities Matters, to provide the Defendant Insurers with information about the Securities Matters, and to cooperate with the Defendant Insurers.

103. The Defendant Insurers' defense obligations under the Policies were triggered by the allegations asserted in the Securities Matters because the allegations set forth therein unmistakably fall within the scope of coverage that the Defendant Insurers provide under the Policies. The Securities Matters were initiated against CME and reported during the Policy Period of the Policies. These facts triggered the Defendant Insurers' duty under the Policies to advance CME's Costs of Defense.

104. The Defendant Insurers nonetheless have attempted to evade their obligations under their Policies. The Defendant Insurers have never reimbursed any of the Costs of Defense incurred by CME in the Securities Matters.

105. The Defendant Insurers' failure and refusal to reimburse CME's Costs of Defense for the Securities Matters constituted a breach of contract and caused CME to expend its own substantial monies to defend the Securities Matters.

106. As a direct, foreseeable and proximate result of the Defendant Insurers' breach of contract, CME suffered damages, including, without limitation, incidental, actual, consequential, and compensatory damages. CME is entitled to recover these damages from the Defendant Insurers, as well as such other appropriate damages and relief permitted by law, all in amounts to be determined at trial.

## COUNT II

**Breach of Contract Regarding Indemnity - Against The Defendant Insurers**

107. Plaintiff repeats and realleges each and every allegation contained above and below as if fully set forth herein.

108. The Defendant Insurers sold the Policies to CME, which obligate the Defendant Insurers to pay "Loss," including, among other things, "compensatory damages, punitive or exemplary damages, the multiple portion of any multiplied damage award, settlements and Costs of Defense."

109. CME incurred and paid Costs of Defense that exceeded the retention applicable under the Policies.

110. CME and the Receiver have demanded that the Defendant Insurers pay the damages that CME has incurred in the Underlying Securities Actions, including, without limitation: (a) the $535.5 million default judgment in the Class Action; (b) the approximately $40 million award (plus interest) obtained by Starr Investments in the Starr Arbitration; and (c) the default judgment in excess of $40 million obtained by the SEC.

111. CME fulfilled all of its duties under the Policies, including the payment of premiums, as well as any duty it may have had to notify the Defendant Insurers of the Securities Matters, to provide the Defendant Insurers with information about the Securities Matters, and to cooperate with the Defendant Insurers.

112. The Defendant Insurers' obligations to pay Loss, including damages, under the Policies were triggered by the Final Awards and the default judgments in the Class Action and the Starr Lawsuit. As some of the Defendant Insurers have acknowledged, the Securities Matters (at least in part) constitute Securities Claims that were initiated against CME and reported during the Policy Period of the Policies. These facts, coupled with the entry of the Final Awards and the default judgments in the Class Action and the Starr Lawsuit, have triggered the Defendant Insurers' affirmative duty under the Policies to pay covered Loss, including damages arising from the Securities Matters.

113. The Defendant Insurers nonetheless have attempted to evade their obligations under their Policies. The Defendant Insurers have never paid any portion of the Final Awards or the default judgment in the Class Action.

114. The Defendant Insurers' failure and refusal to pay for the damages arising from the Final Awards and the default judgment in the Class Action constituted a breach of contract.

115. As a direct, foreseeable and proximate result of the Defendant Insurers' breach of contract, CME suffered damages, including, without limitation, incidental, actual, consequential and compensatory damages. CME is entitled to recover these damages from the Defendant Insurers, as well as such other appropriate damages and relief permitted by law, all in amounts to be determined at trial.

**COUNT III**

**Breach of Duty of Good Faith and Fair Dealing (Consequential Damages) Against The Defendant Insurers**

116. Plaintiff repeats and realleges each and every allegation contained above and below as if fully set forth herein.

117. The Defendant Insurers have wrongfully refused and continue to refuse, without any reasonable justification, to pay CME's "Loss" for the Securities Matters, including CME's Costs of Defense and the damages arising from the Final Awards and the default judgments in the Class Action and the Starr Lawsuit.

118. The Defendant Insurers owed CME a duty of good faith and fair dealing under the Policies.

119. The purpose of the Policies was not merely to provide for the payment of certain insured Losses. Rather, CME purchased the Policies for the specific purposes of: (a) obtaining real-time funding (as distinct from reimbursement of defense costs at the conclusion of a matter) to defend claims asserted by third parties against CME and its directors, officers and employees; and (b) ensuring that such prompt defense funding is available to CME for Securities Claims. Indeed, coverage for Securities Claims is the only coverage available to CME under the Policies.

120.     Among other things, upon information and belief, the Defendant Insurers:
(a) unreasonably and with wrongful intent refused to advance CME's Costs of Defense for the
Securities Matters, despite CME's full compliance with all of the requirements of the Policies,
including its satisfaction of the applicable retention; (b) caused CME to suffer a $40 million
adverse award in the Starr Arbitration based on their wrongful refusal to advance Costs of
Defense, resulting in Loeb defending this matter "on the cheap"; (c) caused CME to take default
judgments of $535.5 million in the Class Action and $41,894,082.05 in the SEC Lawsuit; (d)
failed to conduct a timely, honest, diligent and informed investigation of CME's claims for
coverage, instead withholding coverage for CME's Costs of Defense while waiting for adverse
developments in the Starr Arbitration, Class Action, and Starr Lawsuit that could justify their
previously unfounded and predetermined wrongful coverage denials; (e) misled CME into
believing that they were considering providing coverage for the Securities Matters, despite their
intention never to do so; (f) unreasonably refused an assignment of their policies to the plaintiffs
in the Class Action that could have resolved that matter and avoided the subsequent default
judgment; and (g) failed to exercise good faith and due care in protecting the interests of CME
and have otherwise acted in bad faith.

121.     The Defendant Insurers' actions with respect to CME's claims for coverage under
the Policies were willful, malicious, without justification or excuse, and/or taken in bad faith to
further their own improper objectives and self-interests.  In addition, the Defendant Insurers'
conduct was carried out with reckless indifference to the rights and interests of CME, and to the
prejudice and detriment of CME, in violation of applicable law.

122.     The Defendant Insurers did not act as a reasonable insurer would have acted
under the same or similar facts and circumstances.

123.     The Defendant Insurers' actions breached the duty of good faith and fair dealing
that they owed to CME.

124. The Defendant Insurers' wrongful actions and bad faith stripped CME of prompt funding for the defense of the Securities Matters – one of the core bargained-for purposes for which CME purchased the Policies.

125. As a direct and proximate result of the Defendant Insurers' bad faith conduct and refusal to advance CME's Costs of Defense for the Securities Matters, CME was unable to defend itself in these matters, which led to the $40 million Final Award, the $535.5 million default judgment in the Class Action, and the default judgment of $41,894,082.05 in the SEC Lawsuit. These damages were the foreseeable result of the Defendant Insurers' wrongful refusal to defend the Securities Matters and were contemplated by the parties as the probably result of a breach of the Defendant Insurers' obligation to advance Costs of Defense at the time CME purchased the Policies.

126. As a direct, foreseeable and proximate result of the Defendant Insurers' bad faith conduct, CME is entitled to receive the full amount of its damages, including, without limitation, incidental, actual, consequential and compensatory damages, as well as such other appropriate damages and relief permitted by law, together with pre-judgment interest, post-judgment interest, an award of fees incurred in this case (including attorneys' fees), expenses, disbursements and costs. These consequential damages include, without limitation: (a) the $40 million Final Award; (b) the $535.5 million default judgment in the Class Action; (c) the $41,894,082.05 default judgment in the SEC Lawsuit ;and (d) the harm to CME's ability to continue as a going concern.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Awarding Plaintiff damages equal to the Costs of Defense that the Defendant Insurers have wrongfully refused to pay, in amount to be proven at trial;

B. Awarding Plaintiff damages in the amount of the full $17.5 million aggregate limits provided under the Policies that the Defendant Insurers have wrongfully refused to pay for

the damages arising from the Securities Matters, including, without limitation, the Final Awards and the default judgments in the Class Action, the SEC Litigation and the Starr Lawsuit;

C. Awarding Plaintiff consequential damages in an amount to be determined at trial, but that at a minimum includes: (a) the $40 million Final Awards; (b) the $535.5 million default judgment in the Class Action; (c) the default judgment for $41,894,082.05 in the SEC Lawsuit; and (d) the significant consequential damages resulting from the Defendant Insurers' misconduct as alleged herein, including lost profits and harm to CME's ability to operate as a going concern.

D. Awarding Plaintiff, for each of its claims, pre-judgment interest, post-judgment interest, together with an award of fees in this case (including attorneys' fees), expenses, disbursements, and costs; and

F. Awarding Plaintiff such other, further, and different relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: October 26, 2015

HAGENS BERMAN SOBOL SHAPIRO LLP

By *__/s/ Jason A. Zweig__*
JASON A. ZWEIG (JZ-8107)
One Penn Plaza, 36th Floor
New York, NY 10119
Telephone: (212) 752-5455
Facsimile: (917) 210-3980
jasonz@hbsslaw.com

Scott D. Gilbert
W. Hunter Winstead
GILBERT LLP
1100 New York Ave NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 772-2344
Facsimile: (202) 772-2246
gilberts@gotofirm.com
winsteadh@gotofirm.com

*Counsel for Plaintiff Karl P. Barth, as Receiver of China MediaExpress Holdings, Inc.*